UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Donald A. Thomas, Jr.,

　　　　　　　Plaintiff,

vs.

Michael J. Astrue,
Commissioner of Social
Security,

　　　　　　　Defendant.　　　　　Civ. No. 07-3313 (PJS/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI").  The matter is now

before the Court upon the parties' cross-Motions for Summary Judgment.  The

Plaintiff appears by Edward C. Olson, Esq., and the Defendant appears by Lonnie F.

Bryan, Assistant United States Attorney.  For reasons which follow, we recommend

that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

## II.  Procedural History

The Plaintiff first applied for DIB on October 15, 2004, at which time, he alleged that he had become disabled on February 8, 2004.  [T. 58, 72].  The Plaintiff met the insured status requirement at the onset date of disability, and remains insured for DIB through March 31, 2009.  [T. 13].

The State Agency denied his claim on initial review, and upon reconsideration. [T. 38-47, 75-77].  The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on October 30, 2006, a Hearing was conducted, at which time, the Plaintiff appeared, and was represented by counsel.  [T. 25-32, 248-69].  Thereafter, on August 25, 2006, the ALJ issued a decision which denied the Plaintiff's claim for benefits.  [T. 13-24].  On August 30, 2006, the Plaintiff requested an Administrative Review before the Appeals Council, [T. 9], which, on May 10, 2007, denied the request for further review.  [T. 5-7].  Thus, the ALJ's determination became the final decision of the Commissioner.  See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th

Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

### III.  Administrative Record

A.    Factual Background.  The Plaintiff was forty (40) years old at the time of the Hearing.  [T. 61].  He is right handed [T. 103], and completed the sixth grade [T. 252], with past relevant work as a machine operator, assembler, truck driver, cook, and machinist. [T. 106].  The Plaintiff alleges that he cannot work due to degenerative joint disease, and resultant back pain and depression.  [T. 35, 37, 43].

1.    Medical Records.  As a teenager, the Plaintiff underwent gastric bypass surgery, for which he now receives monthly shots of Vitamin B12.  [T. 158, 211, 212].

In August of 2000, the Plaintiff underwent surgery for a laminectomy and discectomy at his L4-L5 vertebrae.  [T. 132, 155, 161, 179, 191, 206, 212].

On April 29, 2004, the Plaintiff was seen by Christopher Thiessen, M.D. ("Dr. Thiessen"), for back pain, after racing his daughter on his bike.  [T. 161].  He reported pain from his right buttock, to his groin and lower back, but no acute distress.  Id.  The

Plaintiff was then working as a truck driver.  Id.  Dr. Thiessen prescribed Flexeril and Hydrocodone.[1]  Id.

On May 13, 2004, the Plaintiff was seen by Dr. Thiessen, for a follow-up visit. [T. 160].  He reported improving symptoms, with some sharp pains from his tailbone to his right hip, and numbness on the back of his leg.  Id.  Dr. Thiessen observed that the Plaintiff's back was quite tender, with no acute distress.  Id.  He prescribed continued Flexeril, Hydrocodone, and Sulindac,[2] with stretching exercises.  Id.

On June 3, 2004, the Plaintiff was seen by Dr. Thiessen, for back pain.  [T. 159].  The Plaintiff reported that he had been able to cease his medications, except for aspirin, and return to work for one (1) week, before he tripped, fell, and re-injured his back.  Id.  Dr. Thiessen observed that the Plaintiff was not in acute distress, and he

---

[1]Flexeril is "indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Physician's Desk Reference, at 1833 (60th ed. 2006).

Hydrocodone bitartrate is "a semisynthetic derivative of codeine used as an antitussive[.]" Dorland's Illustrated Medical Dictionary, at 840 (29th Ed. 2000).

[2]Sulindac "is indicated for acute or long-term use in the relief of signs and symptoms of" osteoarthritis, rheomotoid arthritis, ankylosing spondylitis, acute painful shoulder, and acute gouty arthritis. Physician's Desk Reference, at 1935 (62nd ed. 2008).

diagnosed a strain in the Plaintiff's lumbar spine.  Id.  The Plaintiff was prescribed Flexeril, Hydrocodone, and Sulindac.  Id.

On July 21, 2004, the Plaintiff was seen by Dr. Thiessen for back pain.  [T. 158].  The Plaintiff reported working recently as a tow truck driver, which slightly exacerbated his back pain, with numbness and weakness in his right foot.  Id.  He also reported that his symptoms increased with prolonged sitting or standing, radiating from his right thigh to his calf.  Id.  Dr. Thiessen scheduled an MRI scan, and prescribed Hydrocodone.  Id.

On September 20, 2004, and September 30, 2004, the Plaintiff was seen for increased back pain, after he changed a tire.  [T. 154-55].  The Plaintiff reported increased pain in his back, thigh, and testicle, with weakness in his right leg, and difficulty with urination.  [T. 155].  The Plaintiff had doubled his dosages for Flexeril and Hydrocodone, and used a cane, due to his weakness.  [T. 156].  The Plaintiff also reported increased irritability and depression, but no suicidal ideation.  [T. 155].  The Plaintiff's latest MRI scan showed a new disk herniation at his L2-L3 vertebrae.  [T.

156].   Dr. Thiessen prescribed Fluoxetine,[3] and referred the Plaintiff for a neurosurgical consultation.  [T. 154].

On October 11, 2004, the Plaintiff was seen by Stefan J. Konasiewicz, M.D. ("Dr. Konasiewicz"), for a neurosurgical consultation.   [T. 143].  The Plaintiff reported that, since slipping on ice on April 4, 2004, his back and leg pain had increased, with numbness in his legs and feet, and pain radiating into his right groin and right knee.  Id.  He also reported spasms in his right foot and low back, with urinary incontinence, and pain in his right testicle.  Id.  The Plaintiff reported no pain in his left leg, and no problems with his neck or arms.  Id.  Following a physical examination, Dr. Konasiewicz observed that the Plaintiff was not in acute distress, although he winced when moving his back.  Id.

Dr. Konasiewicz also observed that the Plaintiff had a good range of motion in his neck, but diminished strength in his right leg, and lumbar flexion, extension, rotation, and bending, limited to seventy-five (75) percent.  [T. 144].  Upon review of an MRI scan, Dr. Konawiesicz confirmed the Plaintiff's diagnosis of lumbar degenerative joint disease, with a new disk herniation at the L2-L3 vertebrae.  Id.  Dr.

---

[3]Fluoxetine, which is the generic name for Prozac, "is indicated for the treatment of major depressive disorder."  Physician's Desk Reference, at 1839 (62nd ed. 2008).

Konasiewicz concluded that the Plaintiff's symptoms were fairly mild, and he recommended conservative treatment, including physical therapy, Flexeril, and Lortab,[4] with epidural steroid injections as a potential, future treatment.  Id.

On March 31, 2005, the Plaintiff was seen by Dr. Thiessen, for chronic pain and depression.  [T. 153].  The Plaintiff reported that he was in the beginning stages of a divorce, resulting in severe depression.  Id.  The Plaintiff reported irritability, suicidal ideation, and difficulty sleeping.   Id.   Dr. Thiessen referred the Plaintiff for counseling, and prescribed Fluoxetine, Hydrochlorothiazide, and Quetiapine Fumarate.[5]  Id.

On April 22, 2005, the Plaintiff was seen by Dr. Thiessen, for a follow-up visit. [T. 151].  He reported a fall ten (10) days earlier, with resultant back spasms, although he was able to remain active by walking.  Id.  The Plaintiff also reported that his

---

[4]Lortab is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, at 3259 (62nd ed. 2008).

[5]Hydrochlorothiazide is prescribed for hypertension.  See, Physician's Desk Reference, at 1923 (62nd ed. 2008).

Quetiapine fumarate, which is a generic name for Seroquel, is indicated for the treatment of "depressive episodes associated with bipolar disorder," and "acute manic episodes associated with bipolar I disorder * * * ."  Physician's Desk Reference, at 3452 (62nd ed. 2008).

depression was improving.  Id.  The Plaintiff was then taking Cyclobenzaprine,[6] Fluoxetine, Hydrochlorothiazide, Hydrocodone, and Quetiapine Fumarate.  Id.  Dr. Thiessen reported that the Plaintiff's back was stable, although tender.  Id.

In April of 2005, the Plaintiff attended therapy, and was diagnosed with Bipolar Disorder and amphetamine dependence.  [T. 240].  At that time, it was unclear which of the Plaintiff's symptoms were related to his drug use, rather than his mental health. Id.

On May 10, 2005, the Plaintiff was seen by Dr. Thiessen.  [T. 149].  The Plaintiff reported that his depression was improving, with more energy, less irritability, and improved sleep.  Id.  The Plaintiff also reported no suicidal ideation, although he was stressed due to the pendency of his divorce.  Id.  Although the Plaintiff's back pain had been stable in recent months, the Plaintiff twisted his back on the morning of his appointment, and he reported chronic pain and back spasms. Id.  The Plaintiff also reported that he had refrained from using methamphetamine for approximately five (5) months.  Id.  The Plaintiff requested Ketorolac, and Tramadol,

---

[6]Cyclobenzaprine hydrochloride "is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions."  Physician's Desk Reference, at 3464-65 (62nd ed. 2008).

to relieve his back pain.[7]   Id.   The Plaintiff was then taking Fluoxetine, Hydrochlorothiazide, Hydrocodone, Methocarbamol,[8] Quetiapine Fumarate, and Tramadol. [T. 150].  Dr. Thiessen noted that the Plaintiff's symptoms had stabilized, making surgery unnecessary, although he thought rehabilitation might further improve the Plaintiff's symptoms. [T. 149].  Dr. Thiessen also observed that the Plaintiff was not in acute distress, although he was stiff in his movements. [T. 150].  Dr. Thiessen prescribed Ketorolac and Tramadol, and he referred the Plaintiff for physical therapy and a psychiatric evaluation. Id.

On May 27, 2005, the Plaintiff was seen by Dr. Thiessen, for a follow-up on his medications. [T. 147].  The Plaintiff reported that he was in voluntary treatment for methamphetamine use, and that he had not used methamphetamines in approximately five (5) months. Id.  The Plaintiff was then taking Fluoxetine, Hydrochlorothiazide,

---

[7]Ketorolac tromethamine is "a nonsteroidal anti-inflammatory agent used for short-term management of pain," and is "administered intramuscularly and orally." See, Dorland's Illustrated Medical Dictionary, at 942 (29th Ed. 2000).

Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain[.]" Id. at 1862.

[8]Methocarbamol is "a skeletal muscle relaxant, administered orally, intramuscularly, and intravenously." Dorland's Illustrated Medical Dictionary, at 1099 (29th Ed. 2000).

Hydrocodone, Methocarbamol, Quetiapine Fumarate, and Tramadol.  Id.  Dr. Thiessen

reported that the Plaintiff "has done well both with his chronic pain and depression,"

with no acute distress.  [T. 148].

On February 11, 2006, the Plaintiff was admitted to Mercy Hospital after he

briefly lost consciousness, and recovered with confusion and slurred speech.  [T. 211].

A CT scan showed no abnormalities.  [T. 216-17].  His urine screen was positive for

opiates, tricyclic antidepressants, and marijuana.  [T. 212].  The Plaintiff also reported

having a similar episode of lost consciousness three (3) months earlier, while driving

alone.  Id.  The Plaintiff reported that he had been feeling very well, other than

increased back pain.  Id.  Dr. Thiessen recommended discontinuing Bupropion[9] and

Tramadol.  [T. 211].  He was diagnosed with a probable seizure, discharged, and

referred to a neurologist.  Id.

In April and June of 2006, the Plaintiff was seen for anxiety attacks and

exacerbated back pain.  [T. 206, 208].  He was advised to follow up with his family

doctor.  Id.

-----

[9]Bupropion, which is a generic name for Wellbutrin, is "indicated for the treatment of major depressive disorder."  Physician's Desk Reference, at 1612 (62nd ed. 2008).

On August 12, 2006, Wolcott S. Holt, M.D. ("Dr. Holt"), reported that the Plaintiff was "disabled from any and all occupations because of a paroxysmal loss of conscious protection and chronic and intractable low back pain on an ongoing basis * * * ." [T. 241].

From August 18, through August 20, 2006, the Plaintiff was admitted to Mercy Hospital, for Chronic Obstructive Pulmonary Disease ("COPD"), and bronchitis, with symptoms of wheezing and shortness of breath. [T. 190-91]. He also reported smoking one (1) pack of cigarettes daily. [T. 191]. He was prescribed Azithromycin, Prednisone, and Rocephin,[10] and a nebulizer, and was discharged in stable condition. [T. 190, 202].

---

[10]Azithromycin is "indicated for the treatment of patients with mild to moderate infections caused by susceptible strains of * * * designated microorganisms." Physician's Desk Reference, at 2574 (62nd ed. 2008).

Prednisone is "a synthetic glucocorticoid derived from cortisone, administered orally as an anti-inflammatory and immunosuppressant in a wide variety of disorders." Dorland's Illustrated Medical Dictionary, at p. 1450 (29th Ed. 2000).

Rocephin is a trademark for a preparation of ceftriaxone sodium. See, Dorland's Illustrated Medical Dictionary, at p. 1583 (29th Ed. 2000). Ceftriaxone sodium is "a semisynthetic, * * * broad-spectrum cephalosporin antibiotic effective against a wide range of gram-positive and gram-negative bacteria." Id. at 304.

In October of 2006, the Plaintiff was seen several times for his Pain Management Program. [T. 229-39]. He reported cooking, doing dishes, vacuuming, and showering, with the ability to sit or stand for thirty (30) minutes, and to walk for five (5) to six (6) blocks. Id. He also reported sharp pain, with a Pain Management Plan to change positions, and the use of heating pads and cold packs. Id. The Plaintiff also reported that his pain improved through the use of certain breathing techniques. [T. 229]. However, the Plaintiff used a cane, and was tender upon palpation. [T. 231, 238]. His Methadone[11] prescription was decreasing his pain, and permitting increased activity. [T. 235].

On October 27, 2006, Paul Dewey, M.D. ("Dr. Dewey"), completed an Residual Functional Capacity ("RFC") Assessment, in which he opined that the Plaintiff is capable of lifting less than ten (10) pounds frequently, and twenty (20) pounds occasionally, in a work environment. [T. 242]. He also opined that the Plaintiff could not sit or stand for more than two (2) hours in an eight (8) hour workday, with position changes every thirty (30) minutes. Id. Dr. Dewey also concluded that the Plaintiff would need to lie down at unpredictable intervals, during

---

[11]Methadone hydrochloride is "a synthetic narcotic," which is "used as an analgesic." Dorland's Illustrated Medical Dictionary, at p. 1098 (29th Ed. 2000).

a workday, due to his failed back surgery, his right knee instability, and his depression.  [T. 243].  Dr. Dewey further concluded that the Plaintiff should not be permitted to stoop, crouch or climb, with only occasional twisting.  Id.  Lastly, Dr. Dewey concluded that the Plaintiff's impairments would require absences in excess of three (3) times per month.  [T. 245].

  2. Evaluations.  In February of 2005, in support of his application for DIB and SSI, the Plaintiff completed a Function Report.  [T. 83].  He reported living alone, watching television, fixing his own meals, and attending physical therapy.  Id.  He also reported that he required a cane when walking, and a chair in the shower, suffered occasional incontinence, and had difficulty putting on his socks.  [T. 84, 89].  The Plaintiff also reported that he was able to shovel light snow, do laundry, and perform minor household repairs, although he was not able to lift more than five (5) pounds.  [T. 85].  The Plaintiff was able to drive and shop without assistance, as well as manage his finances.  [T. 86].  The Plaintiff was not able to squat and bend, or to stand for long periods of time.  [T. 88].  However, he reported that he could pay attention "as long as needed," and that he could follow either written or spoken instructions without difficulty.  Id.

In March of 2005, the Plaintiff was evaluated by Ray M. Conroe, Ph.D. ("Dr. Conroe"), and R. Owen Nelsen, Ph.D., L.P. ("Dr. Nelsen"). [T. 164]. Dr. Conroe and Dr. Nelsen concluded that the Plaintiff's medical impairments and depressive disorder were not severe, id., and resulted in only mild restrictions of activities of daily living, social functioning, and his ability to maintain concentration, persistence, and pace. [T. 174]. Although the Plaintiff reported irritability, decreased appetite, insomnia, and pain, Dr. Conroe and Dr. Nelsen reported that the Plaintiff's activities of daily living were intact. [T. 176]. The Plaintiff's vocational capacity was also evaluated, in March of 2005, which recommended only that the Plaintiff be restricted from climbing, and only occasionally stoop, kneel, crouch, and crawl. [T. 178, 180]. The evaluator observed that the Plaintiff had spasms in his right foot and lower back, with diminished right leg strength, for which he used a cane. [T. 179]. Ultimately, the evaluator found no limits on push/pull activities, but found that the Plaintiff was capable of lifting ten (10) pounds frequently, and twenty (20) pounds occasionally, and was capable of sitting or standing up to six (6) hours in an eight (8) hour workday. [T. 179].

In April of 2005, the Plaintiff completed an updated Disability Report, in which he reported that his depression had worsened. [T. 91]. In June of 2005, the Plaintiff

completed an updated Function Report, in which he reported that he was no longer able to perform yard work.  [T. 99].  He also reported that sometimes he did not want to be around other people, and that he had difficulty concentrating and finishing tasks, due to his medications.  [T. 102-03].  In June of 2005, the Plaintiff also completed a Work History Report, in which he advised that he had worked as a machine operator, assembler, truck driver, cook, and machinist, at various times from 1990 through 2003.  [T. 106].  As a machinist and machine operator, the Plaintiff was required to lift fifty (50) pounds frequently.  [T. 112, 114].  His other jobs did not require him to lift more than ten (10) pounds frequently, with twenty (20) pounds occasionally.  [T. 107-111, 115].  In addition, several of the Plaintiff's past jobs required standing for long periods of time.  [T. 107-115].

In June of 2005, the Plaintiff's mother also completed a Function Report, in which she reported that the Plaintiff was living with her.  [T. 118].  She stated that he had difficulty sleeping, and required a chair in the shower, but that he was able to do laundry, vacuum, and prepare basic meals.  [T. 119-20].  According to his mother, the Plaintiff was able to grocery shop, drive, manage his money, and visit friends.  [T. 121-22].  She also reported that he sometimes sat on the couch and talked to himself, while rocking back and forth.  [T. 124].

- 15 -

In September of 2006, the Plaintiff completed an updated Disability Report, in which he reported constant pain, an inability to lift more than five (5) pounds, and an inability to sit or stand for long periods of time. [T. 126-27]. The Plaintiff also reported that he quit working on February 8, 2004, because he could not get along with the owners at his place of employment. [T. 127]. He reported attending physical therapy twice per week. [T. 130]. The Plaintiff was then taking Cyclobenzaprine, Fluoxepine, Hydrochlorothiazide, Hydrocodone, and Vitamin B12 injections. [T. 130-31].

In September of 2006, the Plaintiff also completed a Work History Report, in which he reported that his mood swings had improved with new medication. [T. 135].

B.    <u>Hearing Testimony</u>. The Hearing on October 30, 2006, commenced with some opening remarks by the ALJ, in which he noted the appearance of the parties for the Record. [T. 250]. The ALJ asked the Plaintiff's attorney if he had any objections to the evidence being introduced into the Record, or to the qualifications and impartiality of the Vocational Expert ("VE"), and the Plaintiff's attorney stated that he did not. [T. 250-51]. In addition, the Plaintiff waived a formal reading of the issues in his case. [T. 250]. Next, the ALJ asked the Plaintiff's counsel if he had any opening comments. [T. 251].

The Plaintiff's attorney began by stating that the Plaintiff had completed school through the sixth grade.  Id.  The Plaintiff's attorney further stated that the Plaintiff's impairments resulted in such severe limitations, that he was unable to perform his past relevant work, or any competitive employment.  [T. 252].  In support of this assertion, the Plaintiff's attorney referenced the RFC opinion, which was rendered by Dr. Dewey, in October of 2006.  Id.

The ALJ then swore the Plaintiff to testify, and began his questions by asking about the Plaintiff's education.  Id.  The Plaintiff confirmed that he completed only the sixth grade, and that he had not served in the military.  [T. 252-53].  The Plaintiff also confirmed that he had worked as a truck driver, cook, machine operator, assembler, and machinist.  [T. 253-54].  The Plaintiff advised that he no longer worked as a truck driver, because he was unable to sit for more than thirty (30) minutes without changing positions.  [T. 254].

The Plaintiff testified that, in a typical day, he took a shower, did dishes, vacuumed, and walked five (5) blocks to the post office.  Id.  The Plaintiff testified that he had trouble sleeping, and that he needed to lay down several times each day, for a total of a few hours.  [T. 255].  He further testified that he was able to cook and

drive.  Id.  The Plaintiff confirmed that he had not used methamphetamines in approximately one (1) year.  [T. 256].

As of the date of the Hearing, the Plaintiff testified that he was taking Cymbalta, Gabapentin, Methadone, and Neurontin,[12] and that he had recently stopped taking Prozac and Seroquel.  [T. 257].  He confirmed that he had suffered a seizure in March of 2006, and that his therapist thought it had been caused by taking Prozac, Seroquel, and Wellbutrin, at the same time.  Id.  He testified that he had not had any further seizures.  [T. 258].

The Plaintiff's attorney then initiated his examination of the Plaintiff by asking him what had occurred on February 8, 2004, which was the alleged onset date of his disability.  [T. 258].  The Plaintiff advised that on that date, while shoveling snow, he herniated a disk in his back.  Id.  The Plaintiff further testified that he had previously herniated another disk, several years earlier, which ultimately required surgery.  Id.  The Plaintiff stated that he continued to suffer nerve damage from his earlier injury, with weakness in his knee, and numbness in the back of his leg.  Id.  The Plaintiff

_____

[12]Cymbalta is "indicated for the treatment of major depressive disorder." Physician's Desk Reference, p. 1793 (62nd ed. 2008).

Gabapentin is a generic name for Neurontin.  Neurontin is "indicated for the management of postherpetic neuralgia in adults."  Id. at 2463.

testified that, between his original injury in 2000, and his second injury in 2004, he had been able to return to work. [T. 259].

The Plaintiff then testified that his inability to work had not caused his divorce, which occurred approximately one (1) year before the Hearing, although his divorce increased his depression and stress. Id. The Plaintiff also testified that Dr. Dewey had been his physician for approximately six (6) months, and that he agreed with Dr. Dewey's assessment, that he could lift less than ten (10) pounds frequently, and twenty (20) pounds occasionally, and that he could sit or stand less than two (2) hours per day. [T. 260-61]. The Plaintiff testified, however, that on some days, he was unable to get out of bed, and that he would not be able to work a full-time job, because he would have to miss more than three (3) days per month. [T. 261].

The ALJ then swore the VE to testify, and affirmed that the VE had reviewed the Record, and that he was familiar with jobs within the State of Minnesota. [T. 262]. The VE had no questions for the Plaintiff regarding his past work history, nor did he have any changes or corrections to make to his report. Id.

The ALJ then posed a hypothetical to the VE, asking him to assume a younger male individual, with a limited education, and past work as set out in the Record, with impairments of degenerative disk disease of the lumbar-sacral spine, status post-

surgical intervention, a seizure disorder, and COPD. [T. 262-63]. The ALJ noted that this combination of impairments would limit the individual to sedentary work, with minimal climbing, balancing or stooping, no kneeling, crouching or crawling, and no exposure to concentrated chemicals, dust, fumes, humidity, temperature extremes, unprotected heights, dangerous moving machinery, or vibrations. [T. 263]. In addition, the ALJ postulated that the individual's work would be limited to unskilled, entry-level work, with no frequent or rapid changes in work routine, with only brief and superficial contact with the public, co-workers, or supervisors, with no use of foot controls, and with the need for psychotropic medications. Id. The ALJ asked the VE if that hypothetical individual could perform the Plaintiff's previous relevant work. Id. The VE replied that the individual could not perform the Plaintiff's past relevant work, all of which would require medium levels of exertion. Id.

The ALJ then asked the VE if there was any work, in the regional or national economy, for a person with such limitations, and the VE advised that there were positions, such as bench worker assembly occupations, including vinyl assembler, lampshade assembler, and fishing reel assembler, as outlined in the Dictionary of Occupational Titles, with an excess of 5,000 positions available in Minnesota. [T. 264].

The ALJ then revised the hypothetical, to an individual who required a sit-stand option every thirty (30) minutes, for one (1) to two (2) minutes, and the VE stated that such a limitation would not impact upon his assessment. [T. 264-65]. The ALJ then further revised the hypothetical, so as to assume an individual who would require hourly breaks of fifteen (15) minutes, and who would miss more than two (2) days of work per month, and the VE opined that such an individual could not sustain competitive employment in the identified positions. [T. 265]. The VE then confirmed that his assessment was consistent with the Dictionary of Occupational Titles, with the exception of the sit-stand option which, he testified, was based upon his professional experience. [T. 266].

The Plaintiff's attorney then examined the VE, and asked him if an individual who missed more than two (2) days of work per month could sustain any competitive employment, and the VE agreed that it would preclude competitive employment for any unskilled work. Id. The Plaintiff's attorney then asked the VE if an individual who could not perform activities requiring frequent handling, and frequent fingering, could perform the identified assembly positions, and the VE replied that he could not. [T. 267]. Lastly, the Plaintiff's attorney asked if an individual, who had to avoid even

moderate exposure to chemicals, fumes, and dusts, could perform the identified

assembly positions, and the VE replied that he could.  [T. 268].

The ALJ then asked the Plaintiff if he had any information to add, and the

Plaintiff advised that he was also taking Baclofen and muscle relaxants,[13] at the time

of the Hearing.  Id.  The Plaintiff's attorney concluded by asking the ALJ to contact

Dr. Dewey, if the ALJ ultimately concluded that Dr. Dewey's opinion was

inconsistent with the remainder of the Record.  [T. 268-69].  The ALJ then adjourned

the Hearing, and thanked the Plaintiff for his testimony.  [T. 268].

C.    The ALJ's Decision.  The ALJ issued his decision on January 10, 2007.

 [T. 13-24].  As he was required to do, the ALJ applied the sequential, five-step

analytical process that is prescribed by 20 C.F.R. §§404.1520, and 416.920.[14]  The

---

[13]Baclofen is "used as a muscle relaxant and antispastic in the treatment of multiple sclerosis, spinal cord diseases, and spinal cord injury."  Dorland's Illustrated Medical Dictionary, at 185 (29th Ed. 2000).

[14]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the

ALJ acknowledged that the Record included some evidence, that the Plaintiff worked as a truck driver in 2004, after his alleged onset date. [T. 15]. Nonetheless, given the lack of evidence as to the hours worked, or the wages earned, the ALJ ultimately concluded, as a threshold matter, that the Plaintiff had not engaged in substantial gainful activity since his alleged onset date of February 8, 2004. Id.

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity. Id. After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by degenerative joint disease of the lumbar spine, status post laminectomy and discectomy, and a seizure

---

> regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy. Id. at 754.

disorder.  [T. 16].  The ALJ determined that the Plaintiff's physical impairments resulted in more than minimal limitations on his ability to perform basic work-related activities.  Id.  However, the ALJ found that the Plaintiff's mental impairments -- specifically, his depressive disorder with anxiety features -- caused him to be mildly restricted in activities of daily living, social function, and concentration, persistence and pace, with no episodes of decompensation.  Id.  In addition, the ALJ concluded that the Plaintiff's need for monthly B12 vitamin injections, and hypertension medication, would not impose more than a minimal limitation on his ability to perform work-related tasks.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §404.1520(d).  The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based on the Record as a whole.  [T. 17].  He noted that Listing 1.04 "requires compromise of a nerve root with evidence of neurological deficits and an inability to ambulate effectively."  Id. Based upon a review of the Record, the ALJ concluded that the Plaintiff was able to ambulate effectively, and that his neurological deficits were "relatively mild and * * * limited to the right ankle and foot."  Id.  Accordingly, the ALJ found that the

Plaintiff did not suffer any impairments, individually or in combination, which could be considered medically equal to any impairment described in the Listings.  Id.

The ALJ then proceeded to determine whether the Plaintiff retained the RFC to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy.  Id.  RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  See, Title 20 C.F.R. §§404.1545 and 416.945, and Social Security Ruling 96-8p.  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §§404.1529 and 416.929.

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the objective medical evidence; and the Plaintiff's subjective complaints of pain; the ALJ determined the Plaintiff's RFC to be as follows:

[The Plaintiff] has the residual functional capacity to lift 5 pounds frequently and 10 pounds occasionally; sit 6 hours per 8 hour day with a sit/stand option every 30 minutes for a brief 1-2 minute period; stand or walk 2 hours per 8 hour day; minimal climbing of stairs or ramps; minimal balancing, stooping; no crawling, crouching, or kneeling; no exposure to concentrated chemicals, dust, fumes, or humidity and temperature extremes; no work around unprotected heights, dangerous moving machinery or vibrations; use no foot controls; unskilled, entry level tasks with no frequent or rapid changes in work routine; and no more than brief and superficial contact with co-workers, supervisors, and the general public.

[T. 17].

The ALJ concluded that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's description of the intensity, persistence, and limiting effects of his symptoms.  [T. 18].

In determining the Plaintiff's RFC, the ALJ first considered the testimony of the Plaintiff, that he had been unable to work since February 8, 2004, because he is unable to sit, stand, or walk for prolonged periods, and because he needs to lie down periodically throughout the day.  Id.  The ALJ also considered the Plaintiff's testimony that "his depressive symptoms are so severe that a couple of times per week he is unable to get out of bed," and that "the medication he takes for his depressive symptoms cause him to have difficulty focusing."  Id.  The ALJ also considered the

Plaintiff's testimony that his knee "gives out" when climbing or descending stairs, and that he is only able to lift five (5) pounds, walk two (2) to three (3) blocks, and sit for thirty (30) minutes at a time.  Id.

The ALJ considered the Record, and found that the objective evidence did not support the Plaintiff's assertions of disability.  Id.  In arriving at that conclusion, the ALJ noted that, after the Plaintiff's laminectomy and discectomy in 2000, the Plaintiff was able to return to work full-time, until February 8, 2004, when he quit his employment "because he did not get along with his employer."  Id.  Although the Plaintiff testified differently at the Hearing, by asserting that he stopped working because he re-injured his back while shoveling snow, the ALJ noted that the Plaintiff did not seek any medical treatment, for any reason, in February of 2004, when he stopped working.  Id.  Instead, the Plaintiff first sought medical treatment for increased back, and lower extremity pain, on April 27, 2004, more than two (2) months after he stopped working, and after exacerbating his back pain by racing his daughter on a bicycle.  Id.  The ALJ further noted that the Plaintiff was prescribed stretching exercises and medication, as conservative treatment measures.  Id.

Between April 27, and October 11, 2004, the Plaintiff sought additional treatment for increased pain, after tripping and falling over a tire, changing a tire, and

driving a tow truck.  Id.  The ALJ noted that, even when the Plaintiff was seen by Dr. Konasiewicz for a neurological consultation on October 11, 2004, he was able to walk fairly well, and he had good cervical range of motion, although he had some weakness in his right foot, ankle, hip and knee.  Id.  Moreover, Dr. Konasiewicz concluded that the Plaintiff's symptoms were fairly mild, and required only conservative treatment through medication and physical therapy.  Id.

The ALJ next noted that the Plaintiff did not seek any additional medical treatment for his back condition, and related impairments, until after his claim for DIB benefits was denied in March of 2005.  [T. 18-19].  Even then, the Plaintiff complained of increased pain due to a fall, with significant improvement by April 22, 2005.  [T. 19].  Moreover, the ALJ observed that the Plaintiff did not enter a Pain Management Program until October of 2006, despite two (2) years of consistent recommendations from his physicians.  Id.  The ALJ further noted that the Plaintiff enjoyed significant improvement in functioning, following only a limited participation in the Pain Management Program.  Id.  Overall, the ALJ concluded that the objective medical evidence did not support the Plaintiff's claims of disabling pain in his back and lower extremities.  Id.

The ALJ also found that the Plaintiff's active lifestyle was inconsistent with his assertion of disability.  Id.  Specifically, he noted that the Plaintiff was able to walk to the post office, drive, shovel snow, shop, pay bills, cook, vacuum, wash dishes, do laundry, and perform household repairs.  Id.  The ALJ next considered the Plaintiff's work history, and found that it was inconsistent with his assertion of disability.  Id. Specifically, the ALJ noted that the Plaintiff stopped working because he did not get along with his boss, and that he did not attempt to find alternative employment.  Id. The ALJ also observed that this statement by the Plaintiff, in the Record, was inconsistent with the Plaintiff's testimony at the Hearing.  Id.  In addition, the ALJ acknowledged the evidence in the Record, that the Plaintiff had worked as a truck driver after his alleged onset date, which required activities beyond his RFC, as formulated by the ALJ.  Id.

The ALJ also considered the Plaintiff's more recent medical problems, including his episodes of loss of consciousness, and seizure activity. [T. 20]. Although the ALJ found that the Plaintiff's seizure activity had not reoccurred, since an adjustment of his medications, he concluded that the Plaintiff should be protected from any exposure to tasks involving balancing, climbing, unprotected heights, dangerous moving machinery, or vibrations.  Id.  In addition, the ALJ considered the

Plaintiff's diagnosis of COPD, in August of 2006.  <u>Id.</u>  Given the severity of the Plaintiff's wheezing and coughing symptoms, even with medication, the ALJ found that the Plaintiff's COPD resulted in some functional limitations.  <u>Id.</u>

The ALJ concluded that the Plaintiff experienced mild restrictions in his activities of daily living, his social functioning, and his concentration, persistence, and pace, as a result of his mental impairments.  [T. 16].  In particular, the ALJ acknowledged the Plaintiff's assertion, that he is sometimes uncomfortable around other people, and that he has some difficulty focusing, given his medications.  <u>Id.</u>  The ALJ also recognized that the Plaintiff appeared to have difficulty getting along with others, although he was able to visit with his friends and mother.  <u>Id.</u>  Nevertheless, the ALJ found that the Plaintiff was able to engage in many activities of daily living, and that his depressive and anxiety symptoms had arisen in conjunction with his divorce, between January and May of 2005, and that the symptoms had lessened over time, and with medication.  [T. 17].  Overall, the ALJ found that the Plaintiff's testimony was not entirely credible, with respect to the severity of his limitations, given the evidence in the medical record, the Plaintiff's work history, and his activities of daily living.  [T. 18-19].

The ALJ noted that he had considered the opinion of Dr. Dewey, who had concluded that the Plaintiff was able to lift less than ten (10) pounds frequently, and twenty (20) pounds occasionally, and that the Plaintiff could stand, sit or walk, less than two (2) hours per day, with a requirement to change positions every thirty (30) minutes, and to lie down occasionally, at unscheduled times, as needed. [T. 20]. The ALJ declined to place significant weight on Dr. Dewey's opinion, as he found that it was not supported by objective medical findings, given that diagnostic testing had revealed only mild symptoms, and since the Plaintiff had sought treatment only sporadically, when overexertion caused increased pain. [T. 21]. In addition, the ALJ observed that Dr. Dewey had not performed any functional testing, but instead, relied solely upon the Plaintiff's subjective complaints. Id. The ALJ further noted that Dr. Dewey only began treating the Plaintiff in August of 2006, and then for his breathing problems, rather than his back condition. Id. Accordingly, the ALJ declined to rely on Dr. Dewey's opinion, as to the Plaintiff's RFC. Id.

The ALJ also declined to rely on the opinion of Dr. Holt, who opined that the Plaintiff was disabled from any and all occupations, due to his chronic back pain and his seizure condition. Id. The ALJ found notable that the Record did not contain any treatment, or examination notes from Dr. Holt, and he further noted that the Plaintiff's

seizure had been caused by a particular medication, which he was no longer prescribed. Id. Accordingly, he found no support for Dr. Holt's conclusion of disability. Id.

In addition, the ALJ declined to place significant weight on the opinions of the State Agency physicians, Dr. Conroe and Dr. Nelsen. Id. Although the ALJ found that their opinions were consistent with his finding of no disability, he also acknowledged that additional evidence had been submitted, since the State Agency physicians had completed their assessments, and which the State Agency physicians had not been able to review. Id.

Lastly, the ALJ considered the third-party statement, which was submitted by the Plaintiff's mother. Id. Although he found the mother's statement to be sincere, he also found that it was inconsistent with the objective medical evidence, and that the mother was inherently biased in favor of her son's claims. Id. Accordingly, the ALJ declined to place significant weight on the statement of the Plaintiff's mother. Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC that the ALJ had determined, that the Plaintiff would be unable to perform his past relevant work as a machinist, machine operator, prep cook, production assembler, or truck driver. [T. 22]. The ALJ reached that

conclusion after finding that the Plaintiff could no longer sustain the physical exertion, which would be required by his past work.  <u>Id.</u>

Accordingly, the ALJ noted that the final step was to determine whether there were other jobs, which existed in significant numbers in the national economy, that the Plaintiff could perform given his RFC, age, education, and work experience.  <u>Id.</u> The ALJ noted that the Plaintiff, as a younger individual with a limited education, and an ability to communicate in English, could find employment in a range of unskilled sedentary work, including as a bench assembler, final assembler, fishing reel assembler, and lampshade assembler, of which there were more than 5,000 positions available in Minnesota.  [T. 23].  The ALJ expressly noted that he found the VE's testimony to be persuasive, and as a result, the ALJ determined that the Plaintiff was capable of performing other jobs that existed in significant numbers in the national economy.  <u>Id.</u>

Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled at any time from February 8, 2004, through the date of his decision. <u>Id.</u>

IV.  Discussion

A.  Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services,

16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005), citing <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  <u>Vandenboom v. Barnhart</u>, 421 F.3d 745, 749 (8th Cir. 2005), quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004); <u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001), quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996).  Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, <u>Harris v. Shalala</u>, 45 F.3d 1190, 1193 (8th Cir. 1995); <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.     Legal Analysis.  In support of his Motion for Summary Judgment, the Plaintiff argues that the ALJ failed to give substantial weight to the Plaintiff's treating physician, Dr. Dewey, and that, as a result, the RFC determined by the ALJ was

- 36 -

incorrect.  See, Plaintiff's Memorandum, Docket No. 11, at 10.   The Plaintiff also alleges that the ALJ had an obligation to contact Dr. Dewey, in order to clarify any inconsistencies between his opinion, and the objective medical evidence, before declining to give controlling weight to Dr. Dewey's opinion.   Id. at 11-12.   In addition, the Plaintiff argues that the hypothetical, which was posed by the ALJ to the VE, did not include all of the limitations supported by the record -- an argument which is based solely upon the Plaintiff's contention that the ALJ improperly formulated the RFC.  Id. at 12.

We address each contention in turn.

1.    Whether the ALJ Failed to Give Substantial Weight to the Plaintiff's Treating Physician.

a.    Standard of Review.   When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight.  20 C.F.R. §§404.1527 and 416.927; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  Nevertheless, an opinion rendered by a claimant's treating

physician is not necessarily conclusive.  See, <u>Forehand v. Barnhart</u>, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998).  An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole.  See, <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997); <u>Pena v. Chater</u>, supra at 908; <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir. 1991); <u>Kirby v. Sullivan</u>, 923 F.2d 1323, 1328 (8th Cir. 1991); <u>Ward v. Heckler</u>, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence.  See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846.  In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise.  <u>Id.</u>  As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement.  See, <u>Piepgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir. 1996), citing <u>Thomas</u>

v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).  Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion.  Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician.  The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole."  See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4).  More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5).  When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments.  See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii).  Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not

to be given any weight by the ALJ.  See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)
(1).

        b.    <u>Legal Analysis</u>.  The Plaintiff argues that the ALJ failed to accord
proper weight to the opinions of Plaintiff's treating physician, Dr. Dewey, who opined
that the Plaintiff's impairments would not permit him to stand, walk, or sit, for more
than two (2) hours in an eight (8) hour workday, and would further require him to lie
down, at unpredictable intervals during the day, and to be absent more than three (3)
days per month.  [T. 242-45].  In addition, Plaintiff argues that the ALJ was required,
under 20 C.F.R. §§404.1512(e), and 416.912(e), to recontact Dr. Dewey so as to seek
additional evidence, or clarification, before issuing his decision.

    As previously noted, the ALJ need not give any weight to a treating physician's
conclusory statements regarding total disability.  See, <u>20 C.F.R. §§404.1527(e)(1),
and 416.927(e)(1)</u>; <u>Rogers v. Chater</u>, supra at 602.  If justified by substantial evidence
in the Record as a whole, the ALJ can discount the treating physician's opinion.  See,
<u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846. In regard to the
Plaintiff's physical ailments, it is important to note that, here, the ALJ did not entirely
disregard the opinion of Dr. Dewey.  Rather, he determined that Dr. Dewey's opinion
of disablement was inconsistent with the Record as a whole, which revealed only mild

symptoms, and sporadic treatment, after vigorous activity. [T. 21]. The ALJ specifically noted that Dr. Dewey had only been treating the Plaintiff for six (6) months, and for breathing problems, rather than back pain. Id. Moreover, the ALJ found that the remainder of the Record was devoid of any evidence that the Plaintiff suffered difficulty with hand tremors, as asserted by Dr. Dewey. Id.

The ALJ found the Plaintiff's prior statements to his other treating physicians, including Dr. Konasiewicz, to more accurately describe his symptoms, which included intermittent back and leg pain, with short-term increases in pain after vigorous activity. [T. 18-19]. The ALJ also found Dr. Dewey's opinion, and the Plaintiff's claimed impairments, to be inconsistent with the Plaintiff's own testimony concerning a wide variety of activities that the Plaintiff performed on a daily basis, including walking, driving, shoveling snow, vacuuming, cooking, household repairs, paying bills, and laundry. [T. 19]. We find that the ALJ thoroughly considered, and weighed, all of the medical evidence before him, and properly discounted Dr. Dewey's opinion of October 27, 2006, concerning the Plaintiff's state of disablement, in favor of the

assessments of the other reviewing and treating physicians, and the Record as a whole.

See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.[15]

We are mindful that conflicts in the medical record confronted the ALJ, and the conflict involved competing opinions by a treating physician, and of consultative medical experts.  In Cox v. Barnhart, 345 F.3d 606, 608-609 (8th Cir. 2003), our Court of Appeals reversed a District Court's affirmance of an ALJ's determination to deny benefits, where the determination discredited the opinions of the claimant's treating physician.  There, however, the treating physician's opinions were consistent with substantial evidence in the Record as a whole, which is not the circumstance here. Where, as here, medical evidence conflicts, the obligation of the ALJ is to consider "all of the medical evidence, * * * weigh[] this evidence in accordance with the applicable standards, and attempt[] to resolve the various conflicts and inconsistencies in the record." Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003). After close review, we are satisfied that the ALJ properly weighed the medical

---

[15]In addition, the ALJ was persuaded by the fact that Dr. Dewey did not rely upon any objective tests, or clinical findings, but relied upon the Plaintiff's subjective complaints, which the ALJ had discredited.  We do not say that the ALJ's credibility determinations necessarily trump those of a treating physician, but where, as here, treating physician's opinions are not corroborated by the Record as a whole, we find no error in the ALJ's weighting of Dr. Dewey's opinions.

opinions in the Record, and afforded those opinions the weight they deserved when considered on the Record as a whole.  See, <u>Bentley v. Shalala</u>, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), quoting <u>Cabrnoch v. Bowen</u>, 881 F.2d 561, 564 (8th Cir. 1989).

Moreover, the ALJ did not find that Dr. Dewey's opinion was ambiguous, or required clarification, but only that it was not supported by the weight of the evidence in the full Record.  [T. 21].  Consequently, he was not required to contact Dr. Dewey, notwithstanding the Plaintiff's assertions to the contrary.  See, <u>20 C.F.R. §§404.1512(e)-(e)(1)</u>; <u>Hacker v. Barnhart</u>, supra at 938 ("The regulations provide that the ALJ should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled," but "[t]he regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable."); <u>Goff v. Barnhart</u>, 421 F.3d 785, 791 (8th Cir. 2005)("While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue

is undeveloped.'"), quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004). We therefore find no reversible error in this respect.

　　　　2.　　<u>Whether the RFC Determined by the ALJ Was Incorrect</u>.

　　　　　　a.　　<u>Standard of Review</u>.　The governing law makes clear that credibility determinations are initially within the province of the ALJ.　See, <u>Driggins v. Bowen</u>, 791 F.2d 121, 125 n.2 (8th Cir. 1986); <u>Underwood v. Bowen</u>, 807 F.2d 141, 143 (8th Cir. 1986).　As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole.　See, <u>Stout v. Shalala</u>, 988 F.2d 853, 855 (8th Cir. 1993).

　　　　To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, <u>Shelton v. Chater</u>, 87 F.3d 992, 995 (8th Cir. 1996); <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Ricketts v. Secretary of Health and Human Services</u>, 902 F.2d 661, 664 (8th Cir. 1990).　These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ.　See, <u>Johnson v. Secretary of Health and Human Services</u>, 872 F.2d 810, 814 n.3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by Polaski v. Heckler, supra, and its progeny.  See, e.g., Flaherty v. Halter, 182 F. Supp. 2d 824, 829 (D. Minn. 2001);  Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

> 1.     the claimant's daily activities;
>
> 2.     the duration, frequency, and intensity of the pain;
>
> 3.     precipitating and aggravating factors;
>
> 4.     dosage, effectiveness and side effects of medication;
>
> and
>
> 5.     functional restrictions.

Polaski v. Heckler, supra at 1321-22; see also, Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006)(listing factors for credibility analysis); Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006)(same).

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole.

Cf., <u>Jones v. Chater</u>, supra at 826; <u>Delrosa v. Sullivan</u>, 922 F.2d 480 (8th Cir. 1991); <u>Carlock v. Sullivan</u>, 902 F.2d 1341 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them. See, <u>Ostronski v. Chater</u>, supra at 418; <u>Jones v. Chater</u>, supra at 826; but cf., <u>Johnston v. Shalala</u>, 42 F.3d 448, 451 (8th Cir. 1994) (ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. See, <u>Simonson v. Schweiker</u>, 699 F.2d 426 (8th Cir. 1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." <u>O'Leary v. Schweiker</u>, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, <u>Landess v. Weinberger</u>, 490 F.2d 1187 (8th Cir. 1974). Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole. See, <u>Taylor v. Chater</u>, 118 F.3d 1274, 1277 (8th Cir. 1997); <u>Johnson v. Chater</u>, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied.  For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling.  See, Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).  By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility."  Pena v. Chater, supra at 908; see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997) (ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487.

Among the daily activities, which counterindicate disabling pain, are:  a practice of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; doing yard work, Swope v. Barnhart, 436 F. 3d 1023, 1024 (8th Cir. 2006); and grocery shopping, Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).  Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider

- 47 -

in the evaluation of subjective complaints of pain.  See, <u>Wilson v. Chater</u>, 76 F.3d

238, 241 (8th Cir. 1996).

       b.    <u>Legal Analysis</u>.  In arriving at an RFC, the ALJ found significant

inconsistencies between the Plaintiff's subjective complaints, and the Record as a

whole.  Guided by <u>Polaski v. Heckler</u>, and its progeny, the ALJ found the credibility

of the Plaintiff, as to the severity of his impairments, to be undermined by his medical

records, by the other medical consultants, by the Plaintiff's own testimony concerning

his daily activities, and by the Plaintiff's work history.

In discounting the Plaintiff's testimony, the ALJ referenced medical evidence

in the Record that related to the Plaintiff's complaints.  He noted that the Plaintiff was

able to return to full-time work, following his back surgery in 2000.  [T. 18].  He also

noted that the Plaintiff maintained a good cervical range of motion, and ambulated

well.  <u>Id.</u>  The ALJ also observed that the Plaintiff's treating physicians consistently

recommended conservative treatment, including physical therapy and medication, but

that the Plaintiff did not seek relief from the Pain Management Program, until October

of 2006, long after he stopped working.  [T. 18-19].  Moreover, the ALJ noted that the

Plaintiff enjoyed significant improvement with conservative treatment, and with only

limited participation in the Pain Management Program.  [T. 19].

The ALJ also considered the Plaintiff's active lifestyle, in discounting the Plaintiff's claims of disability, including his ability to maintain a household, vacuum, drive, shovel snow, and more.  [T. 19].  In addition, the ALJ pointed to evidence in the Record, which revealed that the Plaintiff quit his employment in February of 2004, because he had a difficult relationship with his employer, rather than because of any injury, and which further revealed that the Plaintiff had worked as a truck driver, after his alleged onset date.  Id.

The ALJ did not completely discount the Plaintiff's credibility, and relied on his testimony, as well as evidence in the Record, in limiting the Plaintiff's RFC to only limited exposure to balancing, climbing, unprotected heights, dangerous moving machinery, or vibrations, because of his past seizure activity, and his intermittent back pain.  [T. 20-22].  In addition, the ALJ limited the Plaintiff's RFC to preclude exposure to concentrated chemicals, dust, fumes, or humidity and temperature extremes, because of his COPD diagnosis.  Id.  The ALJ also limited the Plaintiff to unskilled work, with no frequent or rapid changes in work routine, and only brief, superficial contact with others, because of his chronic back pain.  [T. 22].

In sum, "[w]here adequately explained and supported," as we find to be the case here, "credibility findings are for the ALJ to make."  Dukes v. Barnhart, 436 F.3d 923,

928 (8th Cir. 2006), quoting <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000).  As a consequence, "[b]ecause the ALJ was in a better position to evaluate credibility, we defer to his credibility determinations as long as they were supported by good reasons and substantial evidence."  <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006), citing <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).

Nonetheless, we acknowledge that, "[a]lthough the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, we have also stated that a claimant's residual functional capacity is a medical question."  <u>Lauer v. Apfel</u>, 245 F.3d 700, 703-04 (8th Cir. 2001)[internal quotations omitted], citing <u>Roberts v. Apfel</u>, 222 F.3d 466, 469 (8th Cir. 2000), and <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000).  Accordingly, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  <u>Id.</u> [internal quotations omitted], citing <u>Dykes v. Apfel</u>, 223 F.3d 865, 867 (8th Cir. 2000), and <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000).

Here, however, the ALJ cited to ample medical evidence, which revealed that the Plaintiff's impairments were less disabling than he claimed, and which disclosed that his back pain, while chronic, was intermittent, and was treated successfully

through conservative means.  We conclude, therefore, that the ALJ's formulation of the RFC was not improper, and was supported by sufficient medical evidence.  We find no reversible error in this respect.

       3.    <u>Whether the ALJ Correctly Formulated the Hypothetical for the VE</u>.

       a.    <u>Standard of Review</u>.  It is well-established that a hypothetical question must precisely set out all of the claimant's impairments that the ALJ accepts as supported by the Record.  See, <u>Hallam v. Barnhart</u>, 2006 WL 3392179 at *2 (8th Cir., November 27, 2006)(ALJ must include in hypothetical those limitations that he finds consistent, credible, and supported by record as whole); <u>Lacroix v. Barnhart</u>, 456 F.3d 881, 889 (8th Cir. 2006); <u>Goff v. Barnhart</u>, supra at 794.  "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true."  <u>Goff v. Barnhart</u>, supra at 794, quoting <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001), citing, in turn, <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1015 (8th Cir. 2000); see also, <u>Grissom v. Barnhart</u>, supra at 837.

"A proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant."  <u>Harwood v. Apfel</u>, 186 F.3d 1039, 1044 (8th Cir. 1999), citing  <u>Hutton v. Apfel</u>, 175 F.3d 651, 656 (8th Cir. 1999).  The

hypothetical does not need to include medical terminology from the Record, but should capture the "concrete consequences" of the supported impairments.  Lacroix v. Barnhart, supra at 889, citing Roe v. Chater, supra at 676-77; see also, Gill v. Barnhart, 2004 WL 1562872 *7 (D. Neb., July 13, 2004); Hunt v. Massanari, supra at 625.

       b.   Legal Analysis.  The Plaintiff alleges that the ALJ posed a flawed hypothetical to the VE, which failed to capture the concrete consequences of the Plaintiff's alleged disabilities.  See, Plaintiff's Memorandum, supra at 12.  The argument is based solely upon the Plaintiff's contention that the ALJ formulated an improper RFC, by disregarding Dr. Dewey's opinion.

     As already detailed, the ALJ is only required to include, in his hypothetical, those impairments that he finds to be supported by the Record.  See, Lacroix v. Barnhart, supra at 889.  We have already concluded that the ALJ properly discounted Dr. Dewey's opinion, and supported his formulation of the Plaintiff's RFC with reasons, and references to the Record, and therefore, the Plaintiff's argument to the contrary is without merit.

     Moreover, we note that, based upon his consideration of the Plaintiff's limitations, the ALJ crafted his hypothetical to reflect the Plaintiff's limitations,

assuming that the individual would perform only unskilled, entry-level work, with no frequent or rapid changes in routine, and only brief, superficial contact with others, and to include a sit/stand option every thirty (30) minutes. [T. 263-65]. He also asked the VE to consider the Plaintiff's impairments, including degenerative disk disease of the lumbar-sacral spine, a seizure disorder, and COPD. [T. 263].

In response, the VE testified that he considered the limitations, which were set forth in the hypothetical, and he concluded that jobs were available, in the regional economy, that satisfied those assumed restrictions. [T. 264-65]. The ALJ then asked the VE if the individual could remain employed if he missed work two (2) days per month, and needed a fifteen (15) minute break every hour, and the VE stated that he could not. [T. 265]. Given that the ALJ included all of the relevant limitations, in his formulation of the Plaintiff's RFC, the VE's testimony constituted substantial evidence to support the ALJ's decision concerning the Plaintiff's ability to work. Accordingly, we conclude that the assumptions, which were employed by the ALJ in proposing a hypothetical to the VE, properly included those restrictions on the Plaintiff's functional capacities that were consistent with the Record as a whole, and we find no reversible error on this score.

NOW, THEREFORE, It is –

- 53 -

RECOMMENDED:

1.    That the Plaintiff's Motion [Docket No. 10] for Summary Judgment be denied.

2.    That the Defendant's Motion [Docket No. 17] for Summary Judgment be granted.

Dated:  July 7, 2008                     *s/Raymond L. Erickson*
                                         Raymond L. Erickson
                                         CHIEF U.S.  MAGISTRATE JUDGE


**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **July 24, 2008**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing by no later than **July 24, 2008**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.